# Southern Surety Company of Des Moines, Iowa, v. Miller, Master Commissioner, et al.

(Decided January 28, 1930.)

(As Modified on Denial of Rehearing December 9, 1930.)

WHEELER & HUGHES for appellant.

W. A. BERRY for appellees.

OPINION OF THE COURT BY JUDGE CLAY—Affirming.

In this action by T. A. Miller, master commissioner, to recover on a sale bond alleged to have been executed by the Southern Surety Company of Des Moines, Iowa, judgment was rendered in favor of plaintiffs, and the surety company appeals.

In an equitable action pending in the McCracken circuit court, the Massachusetts Bonding & Insurance Company recovered of one R. H. Scott judgment for $3,775.15, and was adjudged a lien on certain property. At the same time the master commissioner was directed to sell the property. At the sale, C. M. Hilliard became the purchaser at the price of $4,000, and the Southern Surety Company, through its local agent, J. F.. Cummings, executed a sale bond payable in six months. When the bond became due, Hilliard failed to pay, and the surety company denied liability. Thereupon execution was issued on the sale bond and levied on the property. The real estate was sold and brought $3,000. Execution for the balance was returned "No property found." The

suit was to recover the balance, including interest and costs, amounting to $1,237.23. The surety company pleaded, in substance, that the local agent was not authorized to sign the bond.

In addition to the above facts, it appears that on December 14, 1925, the day the bond was executed by Cummings, he wrote the vice president of the Southern Surety Company, stating, in substance, that he was mailing an application for a bond for Hilliard for $4,000 to run for six months, and requested him to honor and indorse and mail to his address. On December 17, 1925, Cummings received from E. J. Jones, superintendent of the judicial department, a letter stating that the application did not give sufficient information to draw the bond; that it would be necessary to know the exact title of the case and what kind of a bond was required. The letter asked for full information, and suggested that Cummings have Mr. W. A. Berry, an attorney, submit the form of bond required. On December 19, 1925, Cummings wrote Jones, giving the title of the case and describing more particularly the character of the bond. On December 21, 1925, Jones wrote Cummings that the bond was far different from the bond they had in mind when they wrote on December 17th, and further stating that the bond which he then described was an obligation which their underwriting committee would not approve unless they were protected by a deposit of full cash collateral, and adding: "We are very sorry not to be able to write you more favorably and wish you would explain to the applicant that our action in declining to make his bond is no reflection on him personally whatever. It is simply a case of this class of business being on our prohibited list." The surety company heard nothing further in regard to the matter until it was advised by Judge W. A. Berry that the bond was due on June 14th, and he would expect payment to the commissioner.

It further appears that Cummings operated under a written "agency agreement," dated September 9, 1925, the terms of which will be hereafter considered.

The bond was executed on December 14, 1925. The correspondence discloses that the application was mailed to the company on the same date with the request that it be honored and indorsed. It further discloses that the application was rejected, and that the company was not informed of the execution of the bond until about the time of its maturity. It does not appear that the rejec-

tion of the application was ever communicated to the payee of the bond. In the circumstances, the case turns on whether or not Cummings, the local agent, had authority to execute the bond without the written consent of the company. The agency agreement appointed Cummings local agent in Paducah and vicinity. The appointment was on the terms and conditions therein stated. By its terms the agent agreed with the company "to make diligent effort to procure bonds and insurance in the various branches of the company's business," and "to report immediately the transaction of any business on behalf of the company to the company." In clause 5 it was stipulated that "the company has the right to alter, suspend, cancel or abate at any time any policy or bond and direct the return of the unearned premium on such policy or bond, and in such case the Agent shall thereupon pay to the Company on demand the amount of commission received by him on the premium so returned." Section 11 of the agreement is as follows:

"The Agent shall secure the written consent of the Company before contracting or incurring any expense or indebtedness of any kind, *legal included,* on behalf of the Company, or which might result in a charge or claims against the Company. The Agent shall *immediately* forward to the general office of the Company all notices of claims or proceedings received by him."

It is true that the statute provides that no person shall be bound as the surety of another by the act of an agent unless the authority of the agent is in writing signed by the principal. Section 482, Kentucky Statutes. We take it, however, that it is not necessary for the writing to use the word "sign" or "execute" if that is the natural and plain import of the terms employed. In the first place, it appointed Cummings its agent in Paducah and vicinity. The business of the surety company was not to take bonds from others, but to make bonds on behalf of others. The agent did not agree merely to procure applications for bonds, but agreed to "procure bonds." Construed in the light of the company's business, and the purpose to be accomplished, the word "procure" must be given the meaning of "make" or "execute." This view is strengthened by the requirement that the agent "report immediately to the company the transaction of any business on behalf of the company,"

thus showing that he was authorized to transact on behalf of the company the business in which it was engaged, namely, the business of executing bonds. Added force is given by the reservation of the company's right at any time to alter, suspend, cancel, or abate any policy or bond, thus implying the prior execution of such bond by the agent. Indeed, the wording of the agreement taken as a whole is such that any ordinarily intelligent person dealing with the agent would naturally conclude that he was empowered to execute bonds on behalf of the company. Clearly, where the power is given it should not be limited or taken away except by clear and unmistakable language. Section 11 did not provide that the agent should secure the written consent of the company before executing any bond on its behalf. It did provide that he should secure the written consent of the company before contracting or incurring any expense or indebtedness of any kind, legal included, on behalf of the company, or which might result in a charge or claims against the company, and that he should immediately forward to the general office of the company all notices of claims or proceedings received by him. To say the least, the language is equivocal and uncertain in meaning. It deals with expense, indebtedness, attorneys' fees, claims, and proceedings. Considered in the light of the context, and the other provisions of the bond, the provision in question is susceptible of the interpretation that the agent, without first obtaining the written consent of the company, may not settle or compromise any claim arising out of the bond, may not employ attorneys, or incur any expense incidental thereto, but must report all claims and proceedings to the company. In the circumstances it cannot be regarded as a limitation on the power of the agent to execute bonds. It follows that the ruling of the lower court was correct.

Judgment affirmed.

Whole court sitting.